[Civ. No. 2792.  Third Appellate District.—November 22, 1924.]

## C. E. MOHR, as Trustee, etc., Appellant, v. FIRST NATIONAL BANK OF HANFORD (a Corporation), Respondent.

[1] SALES—POSSESSION OF AUTOMOBILES UNDER TRUST RECEIPTS—ACTION BY TRUSTEE IN BANKRUPTCY AGAINST BANK TO RECOVER POSSESSION—CHARACTER OF TRUST RECEIPTS—PRESUMPTIONS—TITLE.—In an action by a trustee of a bankrupt's estate against a bank to recover a number of automobiles, alleged to be a part of the assets of the estate, and which the bankrupt had had possession of under trust receipts in favor of the automobile companies from which he had obtained the cars, where it appeared that such trust receipts were taken up by the bank which paid the indebtedness against the cars, and the bankrupt thereafter gave the bank trust receipts showing that the bank was the owner of the cars, and at the same time also gave the bank promissory notes for the amounts paid by it on each car, it may be presumed in support of the findings in favor of the bank, in the absence of evidence showing the nature of the trust receipts given to the automobile companies, and since the burden of proof was on plaintiff to show title in the bankrupt, that said trust receipts given to the companies were of the same character as those given to the bank; and so viewing the transactions between the companies and the bankrupt, they constituted conditional sales reserving title in the vendors.

[2] ID.—TITLE—ORDINARY COURSE OF BUSINESS FOLLOWED BY BANK—PRESUMPTIONS. — In such action, in reference to the question whether title to the cars passed from the automobile companies to the bank, since the burden of proof was on plaintiff, it may be presumed that the ordinary course of business was followed in the transactions in controversy and that the bank followed a course which would protect its rights in the property.

[3] ID.—TITLE—FINDING—EVIDENCE.—In such action, it cannot be held that the evidence as a whole does not support the finding that title to the property in suit was in the defendant at the commencement of the bankruptcy proceedings, even if it be conceded that there is sufficient evidence to sustain a contrary finding.

[4] ID.—ORIGIN OF BANK'S TITLE—PURPOSE OF TRUST RECEIPTS TO BANK.—In such action, the defendant bank's title to the property

Right of one leaving his chattels in another's possession to claim title against the latter's vendees or creditors, note, 25 **L. R. A. (N. S.)** 782 et seq.

in suit did not originate in the trust receipts given it by the bankrupt, since those receipts were but an acknowledgment by the bankrupt of the bank's title theretofore acquired to the property then in his possession.

(1) 35 **Cyc.**, p. 662.    (2) 22 **C. J.**, p. 126, sec. 65.    (3) 7 **C. J.**, p. 272, sec. 438.    (4) 35 **Cyc.**, p. 663.

APPEAL from a judgment of the Superior Court of Kings County. M. L. Short, Judge. Affirmed.

The facts are stated in the opinion of the court.

D. E. Perkins and K. Van Zante for Appellant.

J. C. C. Russell for Respondent.

FINCH, P. J.—Prior to the commencement of this action G. Frank Prough had been adjudged a bankrupt and the above-named C. E. Mohr had been appointed trustee of the bankrupt's estate. Plaintiff seeks to recover six new automobiles and two new trucks, alleged to be a part of the assets of the estate, and which were in Prough's possession when the trustee took over the assets of the estate and were thereafter taken by the defendant under a claim of ownership. The defendant had judgment and the plaintiff has appealed.

Prough was the proprietor of a garage at Hanford and was engaged extensively in buying and selling Oldsmobile and Chevrolet automobiles and trucks. The Oldsmobile cars in controversy were purchased from J. W. Leavitt and Company and the Chevrolet cars from the Chevrolet Motor Company. The court found that neither company conveyed title to Prough but that the cars were all "billed to G. Frank Prough and that each of said companies held a trust receipt for each and all of said above described property. . . . That subsequent to billing said cars to G. Frank Prough by J. W. Leavitt and Company and Chevrolet Motor Company, that the First National Bank of Hanford, a national banking association, paid the indebtedness against said cars and took up the trust receipts and bills of lading *and the rights of the said J. W. Leavitt and Company and the Chevrolet Motor Company in and to the personal property described*

*in plaintiff's complaint was subrogated to the First National Bank of Hanford, defendant herein,* and the title of said personal property . . . was transferred by said J. W. Leavitt and Company and Chevrolet Motor Company to the First National Bank of Hanford, defendant herein. . . . That subsequent to the paying of the money by the defendant herein for the personal property described in plaintiff's complaint, said G. Frank Prough ratified the acts of the defendant in paying said money to the companies by giving to said defendant . . . a trust receipt signed by said G. Frank Prough in favor of the defendant.'' It is not necessary to determine whether the defendant was legally subrogated to the rights of the two companies mentioned in the findings by the mere payment of Prough's indebtedness to them. If those parts of the findings which relate to subrogation, and are herein italicized, were omitted, the other facts found show a conventional subrogation, and it may be presumed that a conventional subrogation was meant by the language used in the findings. The only question then to be determined is whether the evidence supports the findings. In addition to the trust receipts referred to in the findings as having been given by Prough to the defendant, he at the same time gave the defendant promissory notes for the amounts paid by it on each car. These promissory notes and trust receipts were in the following forms, differing only in dates, amounts and descriptions:

''$1700.00.        Hanford, Calif., Oct. 13, 1920.

''On demand after date, for value received, we promise to pay to the order of The First National Bank of Hanford, Cal., at their office in this city One Thousand Seven Hundred Dollars only, with interest from date hereof, at the rate of 8 per cent per annum until paid, interest payable monthly, and if not so paid both principal and interest to become immediately due and collectible at the option of the holder of this note. This note is secured by a bill of sale for one Oldsmobile Sedan Model 37, Motor No. 22385, Body No. 1579 having an estimated market value of $2578.20 Dollars.

''In case suit be instituted to collect this note or any portion thereof we promise to pay all attorney's fees in addition to the costs allowed by law, and any other expenses incurred in the collection of this note.''

"Received in trust for the First National Bank of Hanford the instruments enumerated below, which the undersigned agrees to hold for the benefit of, on account of, and subject to the order of said First National Bank of Hanford, for the purpose of collecting, selling, transferring, exchanging for other securities or commercial paper, or chattels or otherwise dealing with the same, or any part thereof and paying the proceeds thereof to said First National Bank of Hanford, or its order or holding the chattel or securities for which the same may be exchanged in all respects as the originals, as said bank may direct; and the undersigned acknowledged itself to be a bailee of said instruments for the said First National Bank of Hanford and that the said bank is the owner of said instruments and chattels regardless of the party named therein, or in any endorsement thereon, as payee, endorsee or obligee.

"Dated: October 13, 1920.

"Nature of Securities

"Oldsmobile Sedan No. 37

"Motor No. 22385

"Value $2578.20."

The evidence does not show the form of trust receipts which the court found were held by J. W. Leavitt and Company and the Chevrolet Motor Company and which were taken up by the defendant. **[1]** Since the burden of proof was on plaintiff to show title in Prough, in the absence of evidence showing the nature of the trust receipts given to these companies, it may be presumed in support of the findings that they were of the same character as those given to defendant. So viewing the transactions between these companies and Prough, they constituted conditional sales reserving title in the vendors. (*Vermont Marble Co.* v. *Brow,* 109 Cal. 236 [50 Am. St. Rep. 37, 41 Pac. 1031].) "It has been said that the absolute liability for the price and putting that liability in the form of a note or the like are consistent with the retention of title until the note is paid. Parties can agree to pay the value of goods upon what consideration they please and when a buyer has possession and the right to gain the title by payment, he cannot complain of a bargain by which he binds himself to pay and is not to get the title until he does." (24 R. C. L. 447; *Bierce* v. *Hutchins,* 205 U. S. 340 [51 L. Ed. 828, 27 Sup. Ct. Rep. 524, see, also,

Rose's U. S. Notes]; *Segrist* v. *Crabtree,* 131 U. S. 287
[33 L. Ed. 125, 9 Sup. Ct. Rep. 687]; *Liver* v. *Mills,* 155
Cal. 459 [101 Pac. 299]; *Van Allen* v. *Francis,* 123 Cal. 474
[56 Pac. 399]; *Ross* v. *Thomas,* 24 Cal. App. 734 [142 Pac.
102].)   ''The reservation of title in the seller is valid against
levying creditors of the buyer, and even as against *bona fide*
purchasers for value without notice of the buyer's want of
title.'' (24 R. C. L. 455; *Liver* v. *Mills, supra; Van Allen*
v. *Francis, supra.*)

The only question remaining to be considered is whether
title passed from these companies to the defendant. If title
passed from them to Prough, then any transfer of title by
him to the defendant was void as against creditors, for want
of delivery and change of possession. (Civ. Code, sec. 3440.)
Neither, in that case, would the transactions between Prough
and the defendant constitute valid chattel mortgages as
against the rights of creditors, because not executed or re-
corded as required by law. (Civ. Code, sec. 2957.)

The eight cars in controversy were but a few of many ma-
chines handled by Prough through the defendant bank under
a general arrangement between them. The officers of the
bank were unable to give the details of each particular trans-
action. Samuel Shannon, who was president of the defend-
ant bank during the transactions relative to the property in
question, but who, it seems, was not an officer thereof at the
time of the trial, testified that in 1920 and 1921 he ''was
familiar with the different transactions that took place in
the bank. . . . I couldn't have an independent recollection
of all the transactions of the First National Bank to save my
soul. . . . To have personal knowledge of all these transac-
tions would be impossible; I don't think it is humanly pos-
sible.'' He further testified: ''There were different methods
of handling these transactions between the bank and Mr.
Prough. Now in some instances Mr. Prough would have
some cars billed to him here at Hanford and he would have
sufficient money in the bank to pay for them, and therefore,
would draw a check upon his own account; that was one
method. In other instances there were cars shipped here to
Mr. Prough with a bill of lading and draft, and which the
bank would pay for them cars, understand, and take a trust
receipt for the cars. Then there was another method that

was employed, and that was where Mr. Prough had contracted for certain cars with Leavitt and Company, or the Chevrolet Company, where he had evidently made a certain payment upon the cars, and which he had up to a certain date in which to pay for those cars. Now then, if he took up certain of these cars, why he would pay Leavitt and Company, or whoever it was . . . and the balance of the money coming due, they would send up that trust receipt which they held, and we would pay for the cars, and then we would take a trust receipt in evidence of paying for the cars. The cars were already here in the possession of Mr. Prough and held under trust receipts by these other people." Relative to one of the cars, a Chevrolet truck, Prough testified: "That was bought through another finance company, and the contract ran out with them and I went over to the bank and got the bank to take it over and pay off the finance company." The evidence shows that the other cars in controversy were delivered to Prough from three to eight months prior to the dates of the corresponding promissory notes and trust receipts given to the bank. The inference follows that these cars were handled under either the first or the last method described by the witness Shannon, because if the bank paid for the cars as they were shipped to Prough the dates of the notes and trust receipts would agree with the dates of shipment.

Shannon testified: "When we paid this money to these various companies or banks they evidently sent us the trust receipt they had made to them. They sent us all the papers they had, and then we had Prough enter into some kind of an agreement or trust receipt with us as to the same cars; not as to them same cars, understand, because they in the shuffle and everything got all shuffled around, but the cars we still had against him for certain sums of money, and in those cars were these cars in question, these came in that business. . . . These notes which accompanied these trust receipts were given in evidence of the fact that we paid that money to the factory or to whoever billed the cars. . . . The people that had the cars under a trust receipt drew on our bank a certain amount that was due them under that trust receipt. . . . The Union Trust Company, in the instances we sent them money, had a trust receipt for the car, and we

paid them what they held against the car, they sent the
trust receipt down and we got another trust receipt from Mr.
Prough, and that also applies to each one of those transac-
tions where we drew drafts, and in the meantime, and at the
time the check was drawn, the car was in the possession of
Mr. Prough.'' Prough testified: ''These trust receipts that
I signed, as far as I remember now, have any knowledge,
they were the cars—the money was advanced by the First
National Bank on the dates that these receipts show here.''
He also testified that ''these cars that was originally bought
through some other company and eventually I got the First
National Bank to take over, they weren't always billed to
this company; they were sometimes billed to me, but the bill
of lading, the possession of the cars, went through their
hands before I had an authority to unload them, at all.
Those billings were not always to the finance company; those
billings were not always to the bank, but those papers always
came through the bank.''

Shannon's testimony is uncertain as to whether in every
instance, when the bank took up a trust receipt held by some
other company for a particular car, it received a trust receipt
from Prough for the same car. **[2]** The witness, however,
was stating only the general course of business pursued by
the bank with Prough and disclaimed any recollection of
what was done in each particular transaction. Since the
burden of proof was on plaintiff, it may be presumed that
the ordinary course of business was followed in the transac-
tions in controversy and that the bank followed a course
which would protect its rights in the property. There is
no evidence that the bank transferred to Prough the title
which it received from the holders of the first trust receipts.
**[3]** It cannot be held that the evidence as a whole does not
support the finding that title to the property in suit was in the
defendant at the commencement of the bankruptcy proceed-
ings, even if it be conceded that there is sufficient evidence to
sustain a contrary finding. It is not contended that either
the bank or Prough was guilty of fraudulent conduct or that
they did not act in the utmost good faith in all the transac-
tions in question. **[4]** The bank's title did not originate in the
trust receipts given it by Prough. Those receipts were but

an acknowledgment by Prough of the bank's title theretofore acquired to the property then in his possession.

The references in the promissory notes to bills of sale, and similar references in the testimony of some of the witnesses, evidently had relation to the trust receipts, because the evidence does not show that the bank received any contracts from Prough other than such notes and trust receipts.

The judgment is affirmed.

Plummer, J., and Hart, J., concurred.